PJM/CAH: 2018R00894

_FILED _____ ENTERED
_____ LODGED _____ RECEIVED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MAR 0 8 2019

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
                                    DEPUTY

**IN THE MATTER OF CRIMINAL
COMPLAINTS AGAINST CORTEZ
WEAVER, KEVIN BROOKS, JAMAL
JACKSON, and JERMAINE SUMPTER**

Case No. _19-825 'SAb_

to 19-828-SAb

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Francisco M. Rego, Special Agent with the Federal Bureau of Investigation, being duly

sworn, depose and state as follows:

1.      This affidavit is submitted in support of a Criminal Complaint against Cortez

WEAVER, a/k/a "Corty," a/k/a "Tez," Kevin BROOKS, Jamal JACKSON, and Jermaine

SUMPTER, a/k/a "Jug."  As detailed below, there is probable cause to believe that all four

defendants conspired with each other to (i) distribute and possess with intent to distribute heroin,

in violation of 21 U.S.C. § 846; and (ii) to obstruct, delay, and affect commerce by robbery, by the

unlawful taking of narcotics and narcotics proceeds from the person and presence of victims, in

violation of 18 U.S.C. § 1951(a).

2.      I am an investigative or law enforcement officer of the United States within the

meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law

to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.  I

have been a Special Agent with the FBI since July 2017.  Since May 2018, I have been assigned

to the FBI's Safe Streets Task Force in Baltimore.  As a member of the Safe Streets Task Force, I

have participated in numerous investigations of homicides, non-fatal shootings, firearms

trafficking and related crimes, and narcotics trafficking.  I have conducted or participated in wire-

tap investigations, surveillance operations, the execution of search warrants, the recovery of

substantial quantities of narcotics and narcotics paraphernalia, the recovery of evidence related to

homicides and other violent acts, and the debriefing of informants and cooperating witnesses. I have also reviewed taped conversations and other records relating to narcotics trafficking and homicides. I have made or participated in over 10 arrests for violations of federal and state narcotics laws. I have also received specialized training in the field of narcotics. Through my training, education and experience, I have become familiar with the manner in which narcotics traffickers commonly use violence to further and protect their drug trafficking organizations. I am familiar with the manners in which illegal drugs are transported, stored, and distributed; the methods of payment for such drugs; the possession and use of firearms in connection with the trafficking of such drugs; and the manner in which narcotics traffickers store and conceal the proceeds of their illegal activities.

3.    The statements made in this affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided to me by other law enforcement officers; (c) information provided to me by an FBI confidential source (CS-1); (d) my review of consensually monitored and/or recorded conversations; (e) criminal history records maintained by various law enforcement agencies, including the Baltimore Police Department and the National Crime Information Center; and (f) my training and experience and that of other law enforcement agents and officers.

4.    To the extent that consensually recorded conversations are summarized below, those summaries do not include references to all topics covered during the recorded conversation. Nor do the summaries include all statements made by the speakers on the topics described. All quotations are based on preliminary transcriptions of those conversations and/or my review of the actual recordings. In addition, the participants in many of the conversations used both slang terms and code words. These code words and slang terms, as well as the Defendants' communications

2

in general, are interpreted throughout this affidavit. In some circumstances, I have provided that interpretation in parentheses following the quote. These interpretations are based on (a) information provided by CS-1, who was a party to some of the conversations; (b) my training, experience, and knowledge of this investigation; (c) other law enforcement officers' training, experience, and knowledge of this investigation; and (d) other evidence gathered during the course of this investigation, such as physical surveillance.

5.     Some of the information referenced in this affidavit was provided to investigators by CS-1. CS-1 is providing information in exchange for monetary compensation. CS-1 has provided information in the past that has been independently verified by investigators, and investigators believe that CS-1's information is reliable. In December 2018, CS-1 was arrested and charged with possession of cocaine, marijuana and buprenorphine in the parking lot of a Maryland correctional facility. During the arrest, CS-1 told police officers—falsely—that CS-1 possessed the cocaine, marijuana and buprenorphine in connection with a buy-bust operation as part of CS-1's cooperation with the FBI. CS-1 has acknowledged that CS-1's statement to the police on the date of CS-1's arrest was false.

## PROBABLE CAUSE

6.     Members of the FBI's Baltimore Safe Streets Task Force are investigating criminal activity by rival drug trafficking organizations engaged in a violent feud over a lucrative drug "shop" at the Sunoco gas station[1] located at Baltimore Street and Hilton Avenue in Southwest Baltimore City. One drug trafficking organization has ties to Abington Avenue, just east of the

---

[1]     During the course of the ongoing feud between these rival gangs, the gas station located at 3300 West Baltimore Street has changed over from being a Sunoco to a Marathon.

Sunoco gas station, and the other has ties to Benkert Avenue, just west of the Sunoco gas station. Multiple homicides and shootings have been linked to the turf war between these organizations.

7.　According to CS-1, WEAVER is a violent member of the Abington Avenue organization who carries firearms and is involved in criminal activity including drug trafficking, robbery, and murder.　CS-1 reported that WEAVER and an associate named Dwayne TORRENCE, a/k/a "Rico," were responsible for the July 17, 2017 murder of Maurice Finney, a/k/a "Mitch," and nonfatal shooting of Diamonta Boyd at the Sunoco gas station in the 3300 block of West Baltimore Street, which they carried out in furtherance of their drug trafficking organization.[2] CS-1 also advised investigators that WEAVER was using telephone number (410) 572-7018.

8.　During the week of November 11, 2018, CS-1 placed a call to (410) 572-7018 that was monitored by law enforcement.　During the call, CS-1 made plans to meet WEAVER to discuss a potential "lick," *i.e.*, a robbery opportunity.　Soon after, CS-1 met with WEAVER and recorded a conversation in which they discussed the potential robbery of a drug stash house. Unbeknownst to WEAVER, the robbery opportunity was a fiction; the drug stash house did not exist. WEAVER agreed to carry out the robbery, and he stated that this was "the same shit" that "me and Jugg been doing." "Jugg" is known to investigators as Jermaine SUMPTER. CS-1 knows SUMPTER to be a criminal associate of WEAVER's.　Investigators interpreted WEAVER's comment to mean that he is engaged in an ongoing conspiracy with SUMPTER to commit home invasion robberies of drug stash houses in order to enrich themselves and their drug trafficking organization.

---

[2]　TORRENCE was convicted of the attempted murder of Boyd (among other offenses) in Baltimore City Circuit Court on October 25, 2018 (Case No. 117223006).　As of this writing, WEAVER has not been arrested or charged in connection with the incident.

9.      During the recorded conversation, WEAVER also displayed a firearm to CS-1 and talked about owning several firearms, including a "45," a "357," and a "40." While discussing the potential stash house robbery, WEAVER confessed to having killed "Mitch"—*i.e.*, Maurice Finney, who, as discussed above, was murdered in the 3300 block of West Baltimore Street on July 17, 2017. WEAVER proceeded to describe the murder using specific details that are consistent with surveillance footage and other physical evidence recovered during the investigation. For instance, WEAVER explained that he committed the murder with "Rico" (*i.e.*, TORRENCE), that he wore a mask and "skipped down on" the victim (which is corroborated by the surveillance footage), and that he shot the victim once using a "40" (which is corroborated by the physical evidence from the scene). At the conclusion of their conversation, CS-1 promised to contact WEAVER in reference to the robbery opportunity. After the meeting, CS-1 provided the recording of the conversation to investigators.

10.      During the week of November 18, 2018, CS-1 placed a call to (410) 572-7018 and arranged to meet WEAVER in order to further discuss the fictitious robbery opportunity. Following this call, CS-1 provided a "screenshot" of the call log from CS-1's phone to investigators, which showed a completed call with phone number (410) 572-7018.

11.      During the week of January 7, 2019, investigators learned that WEAVER's (410) 572-7018 number was out of service. On January 9, 2019, WEAVER called CS-1 from a different number, (443) 734-5076. CS-1 answered the call and used the speaker function to allow investigators to monitor the call. During the conversation, CS-1 told WEAVER that CS-1 was trying to get information in reference to a robbery they could commit. WEAVER again stated that he wanted to take part in the robbery.

12.     On January 25, 2019, CS-1 made a phone call to WEAVER, in the presence of investigators, for the purpose of arranging a meeting to further discuss the robbery opportunity. CS-1 explained that CS-1 wanted to introduce WEAVER to an associate who was planning the robbery. Unbeknownst to WEAVER, the associate was an undercover law enforcement officer, UC-1. WEAVER explained that he was not in the area of the proposed meeting location—St. Agnes Hospital—because he was watching his child at a different location. WEAVER agreed to meet with CS-1 at that (second) location, and he subsequently sent a text message to CS-1 that provided an address of "2621 claybrook drive." Investigators believe that 2621 Claybrook Drive is adjacent to the residence of WEAVER's sister, Marquita. Databases of the Maryland Motor Vehicle Administration show that Marquita Weaver is currently residing at 2619 Claybrooke Drive, Baltimore, Maryland 21244.

13.     Pursuant to WEAVER's instructions, CS-1 and UC-1 traveled to the area of 2621 Claybrook Drive in a vehicle equipped by investigators with an audio-video recording device. As CS-1 and UC-1 were arriving, CS-1 made a phone call to WEAVER. WEAVER instructed CS-1 and UC-1 to pull their vehicle around the corner from 2621 Claybrook Drive. CS-1 and UC-1 did as they were told.

14.     A short time later, WEAVER approached CS-1's and UC's vehicle. CS-1 briefly exited the vehicle to greet WEAVER. WEAVER then entered the front passenger seat of the vehicle, and CS-1 sat behind WEAVER. UC-1 remained in the driver's seat.

15.     After WEAVER entered the vehicle, UC-1 introduced himself as "Shi" and claimed to be a member of a drug trafficking organization that was importing large quantities of heroin into the Baltimore area. UC-1 claimed that he was responsible for picking up shipments of heroin from designated stash houses and delivering them to "drop" locations. UC-1 told WEAVER that he

was upset with his confederates because they had failed to fully compensate him for his services. He explained that he wanted someone to help him rob an upcoming shipment of heroin from his confederates and that he would be willing to split the stolen heroin with whomever was willing to commit the robbery.

16.     With respect to the logistics of the robbery, UC-1 explained that his confederates used a different stash location for each shipment of heroin that they delivered to the Baltimore area; that his confederates would notify him of the stash location by sending him an address in a text message; and that he was always expected to arrive at the stash location to pick up the shipment of heroin within an hour of receiving the address. UC-1 explained that the same three individuals were always inside the stash location and that two of the individuals always had firearms on their persons when he arrived. UC-1 stated that he typically picked up multiple kilograms of heroin— as many as five at a time—in connection with each shipment. UC-1 further stated that if WEAVER and his associates agreed to commit the robbery, UC-1 would rent a storage unit at a nearby facility, where WEAVER and his associates could meet with UC-1 after the robbery to divide their respective shares of the stolen heroin. UC-1 told WEAVER that if he was interested in committing the robbery, UC-1 wanted to meet with WEAVER and his associates as a group before the robbery took place.

17.     Throughout the conversation, WEAVER repeatedly indicated that he wanted to commit the robbery. For instance, he explained that he had as many as three associates who could help him commit the robbery—"three people to run through that bitch." He stated that he had multiple firearms, including "a big ass chopper and a lot of big 40s." He further claimed that he had recently committed a similar robbery. "I just hit a lick in the city," he explained. "I ran in a nigga house and got like ten thousand and six ounces of coke." WEAVER also told UC-1 that

7

following the robbery, he intended to "bust down," or break down, the kilogram quantities of stolen heroin into smaller components and sell the stolen heroin through his own distributors. He assured UC-1 that "it [*i.e.*, the robbery] ain't gonna come back on you."

18. Furthermore, at multiple points during the recorded conversation, WEAVER told UC-1 that he intended to kill the individuals who were guarding the stash location after robbing the individuals of their heroin. "Ain't tryin' to leave anybody in that bitch," WEAVER told UC-1. "Nobody coming out of there alive. Fuck no, that'll be stupid. You leave anybody in that bitch alive ... all I gotta do is get in and waste 'em." Similarly, later during the conversation, WEAVER stated, "I gotta kill 'em, right; I can't leave them alone. You get what I'm saying? It's the only thing that gotta happen. Like, they can't be left alive."

19. At the end of the conversation on January 25, 2019, UC-1 and WEAVER exchanged phone numbers. Eleven days later, on February 5, 2019, WEAVER placed a phone call to UC-1. During the phone call, WEAVER told UC-1 that he was just checking in. WEAVER stated that he had notified his associates of the potential robbery and had told them that UC-1 would soon be coming to Baltimore meet them. UC-1 told WEAVER that he would call him back at a later time.

20. UC-1 placed a phone call to WEAVER on February 11, 2019. During the call, UC-1 asked WEAVER what he was doing the following day. WEAVER told UC-1 that he would alert his associates so that UC-1 could meet with the associates as a group. UC-1 responded that he would call WEAVER the following day, *i.e.*, February 12, 2019.

21. On February 12, 2019, UC-1 called WEAVER to arrange a meeting with WEAVER and his associates to further discuss the potential robbery. Later that day, UC-1 met with

8

WEAVER, BROOKS, and JACKSON at a McDonald's restaurant in West Baltimore. UC-1 wore a recording device to capture his interactions with WEAVER, BROOKS, and JACKSON.

22.     During the meeting, UC-1 stated that he was scheduled to pick up multiple kilograms of heroin the following day, and that he wanted assistance from WEAVER, BROOKS, and JACKSON in taking the heroin. WEAVER, BROOKS, and JACKSON indicated that they were interested in assisting UC-1, and all three asked questions or made observations regarding the logistics of the robbery. For example, JACKSON asked whether there were cameras in the area of the stash house where the robbery was going to take place. He also asked whether one of the individuals in the stash house was going to be "strapped" (*i.e.*, carrying a firearm on his person). Similarly, BROOKS observed that "the biggest problem is getting in," *i.e.*, gaining entry into the stash house. He further ensured UC-1 that "a nigga ain't gonna do nothing that's gonna jeopardize you." At the conclusion of the meeting, WEAVER, BROOKS, and JACKSON agreed to meet with UC-1 at a storage facility in advance of the robbery the following day.

23.     On the morning of February 13, 2019, UC-1 placed a phone call to WEAVER for the purpose of ensuring that WEAVER, BROOKS, and JACKSON were going to meet with UC-1 at the storage facility in advance of the robbery. During the call, WEAVER told UC-1 that he was attempting to procure a rental vehicle that he and his associates could use in connection with the robbery. WEAVER later informed UC-1, however, that he was unable to procure the rental vehicle. Later that morning, WEAVER sent a text message to UC-1 in which he stated, "Yoo it was too much short timing I thought you was going just come meet them and then next time you come down so next time soon as you car I'm going get everything done soon." Minutes later, WEAVER sent two additional text messages to UC-1. In the first, WEAVER stated, "So nothing bad can happen and things go wrong lor more homework try watch them a lor more see who all

9

got rockets." In the second message, WEAVER wrote, "Just not trying rush and then everybody fucked up you feel me." Based on my training, experience, and involvement in this investigation, I believe that in the text messages excerpted above, WEAVER was informing UC-1 that he and his associates were unable to organize themselves for the potential robbery due to "short timing," and that WEAVER wanted more information regarding which of the individuals in the stash house would be armed ("try watch them a lor more see who all got rockets").

24.    On February 19, 2019, UC-1 placed a phone call to WEAVER and notified him that he was returning to the Baltimore area to pick up another shipment of heroin in a couple of weeks. WEAVER responded, "Alright, alright. I'm gonna make sure I get everything ready." UC-1 then offered to procure a rental car for WEAVER and his associates. WEAVER responded, "Alright, bet. That's what's up." Later during the call, WEAVER told UC-1 that he would let him know about the rental car as soon as he had spoken with his associates. Six days later, on February 25, 2019, WEAVER sent a text message to UC-1 in which he stated, "Yoo we got a ride now," indicating that he, BROOKS, and JACKSON would not be needing a rental car because they had successfully procured their own vehicle to use in connection with the robbery.

25.    On or about March 6, 2019, CS-1 informed investigators that approximately two days earlier, WEAVER had contacted CS-1 to discuss the potential robbery. Toll records for CS-1's cell phone show that on March 4, 2019, WEAVER made three calls to CS-1's cell phone, none of which were answered. The records further show that later that day, CS-1 returned WEAVER's call and had a conversation with WEAVER that lasted approximately nine minutes and 55 seconds. CS-1 informed investigators that during the conversation, WEAVER said that the last time he was supposed to commit the home invasion robbery with "Shi" (*i.e.*, UC-1), he had been unable to obtain a vehicle in time to commit the robbery. WEAVER also asked CS-1 how well CS-1 knew

10

"Shi." CS-1 responded that CS-1 knew "Shi" because they had previously worked together at a trucking company and that "Shi" was actively involved in distributing large quantities of heroin. WEAVER asked CS-1 whether CS-1 was a personal friend of "Shi." CS-1 advised that they were not close friends. According to CS-1, WEAVER responded, in substance, that he was glad that CS-1 and "Shi" were not good friends because he was planning on killing CS-1 in the stash house and "leaving him stinking in the house" with the other victims, *i.e.*, the individuals responsible for guarding the drugs in the house. WEAVER further told CS-1 that "Shi" had offered to rent a car for WEAVER and his associates, but that WEAVER did not want to commit the robbery in a car rented by "Shi" if WEAVER and his associates were going to kill him.

26.     On March 6, 2019, UC-1 contacted WEAVER to arrange a meeting with WEAVER and his associates to confirm the logistics of the potential robbery. Later that day, UC-1 met with WEAVER, BROOKS and JACKSON at a McDonald's restaurant in West Baltimore. UC-1 wore a recording device, which UC-1 used to record his interactions with WEAVER, BROOKS, and JACKSON. As UC-1 was arriving at the restaurant, he encountered WEAVER exiting a black four-door Nissan Maxima sedan. UC-1 and WEAVER then entered the restaurant together.

27.     A second BPD undercover officer, UC-2, was conducting covert surveillance of the meeting in order to ensure UC-1's safety. After UC-1 and WEAVER entered the restaurant, UC-2, observed an individual later identified as SUMPTER sitting in the black Nissan Maxima that WEAVER had arrived in. UC-2 later observed SUMPTER entering the restaurant with other individuals, finding a seat, and observing the conversation between UC-1, WEAVER, and WEAVER's associates from a distance.

28.     Inside the restaurant, UC-1 met with WEAVER. WEAVER was later joined by JACKSON and BROOKS. When JACKSON arrived, UC-1 asked whether he (*i.e.*, JACKSON)

11

was still "in this," *i.e.*, the robbery. JACKSON responded, "Yeah, hell yeah. Hell yeah." After BROOKS arrived, UC-1 again discussed the robbery with all three defendants. During the discussion, UC-1 explained that he had wasted his money renting a storage unit in connection with the previous, unexecuted robbery plan on February 13, 2019. JACKSON then stated, "it ain't going to waste this time." Later, when the discussion turned to the logistics of the robbery, WEAVER noted that of the three individuals expected to be guarding the stash house, "the nigga in the back" was "probably the only nigga we gotta be worried about." JACKSON agreed, stating "that's why I think that's the only person we gotta worry about—the nigga that got that shit." WEAVER then discussed his plan to neutralize the three individuals whom he expected to be guarding the stash house. "One nigga grab him at the door," WEAVER said. "One nigga grab the nigga in the middle. The other nigga in back." JACKSON later stated, "We ready. We ready. We already got enough artillery to do what the fuck we said then. We gonna get in there." JACKSON also stated that following the robbery, he and his associates would "drop the three"—that is, they would dilute, or "stretch," the stolen heroin with a cutting agent—before selling it in the streets. Throughout the conversation, BROOKS was listening attentively and nodding his head.

29.     On the morning of March 7, 2019, UC-1 exchanged multiple phone calls and text messages with WEAVER in order to make plans to meet up to commit the robbery. UC-1 arranged to meet WEAVER and his associates in the parking lot of a Royal Farms store near a storage facility in the area of the Horseshoe Casino. At approximately 11:21 a.m., WEAVER, BROOKS, JACKSON and SUMPTER arrived in the parking lot in a black four-door Nissan Maxima sedan. WEAVER then exited the Nissan Maxima and approached UC-1's vehicle. WEAVER greeted UC-1 and explained that his associates were reluctant to accompany UC-1 to the storage facility

in advance of the robbery, as UC-1 had previously proposed. "They ain't trying to go the storage locker," WEAVER said. "They talkin' about why the fuck we gotta ride to the storage locker. They talkin' about he probably [u/i] the police. They ain't trying to whip up in the storage locker and get boxed in and all that goofy shit." UC-1 responded that he wanted to "show them" the locker, so that "they know what the fuck they're doing." WEAVER stated he would try to persuade his associates to accompany him and UC-1 to the storage facility. He then exited UC-1's vehicle and returned to the Nissan Maxima.

30.     Minutes later, WEAVER made a call to UC-1. During the call, WEAVER explained that BROOKS, JACKSON and SUMPTER did not believe they needed to accompany WEAVER and UC-1 to the storage facility. "They say everybody don't gotta know," WEAVER said, "as long as I know it's good." WEAVER then exited the Nissan Maxima, got back into UC-1's vehicle, and rode with UC-1 to the storage facility. As WEAVER and UC-1 were entering the storage facility, UC-1 asked WEAVER, "They still about it [*i.e.*, the robbery], right?" WEAVER responded, "Yeah, they still about it. They just don't want to come to the storage, talking about, the police might be sitting back there, we can't get out."

31.     Upon arriving at the storage facility, WEAVER and UC-1 exited UC-1's vehicle, and UC-1 brought WEAVER up a flight of stairs, where he showed WEAVER and empty storage locker. After viewing the locker, UC-1 and WEAVER returned to UC-1's vehicle. Inside the vehicle, UC-1 told WEAVER, "you could just rock with me," meaning that WEAVER could ride with UC-1 from the storage facility to the stash house where the robbery was to take place. WEAVER initially agreed, but then he stated that he wanted to get back "in the car with them [*i.e.*, BROOKS, JACKSON, and SUMPTER] for real, so I can make sure they good." WEAVER continued: "Like they on some goofy shit, you feel what I'm saying. I need to make sure they head

clear, like y'all need to clear that shit up. All that goofy shit y'all doing need to stop now, cause I ain't with all the goofy shit, man. Like go in this motherfucking house and y'all get me shot. I ain't with none of that."

32.     Approximately two minutes later, UC-1 exited his vehicle and gave the arrest signal to law enforcement officers who were waiting nearby. Multiple officers then approached the vehicle and placed WEAVER under arrest. During a search of WEAVER's person, the officers recovered a Ruger .357 revolver from the front inside pocket of WEAVER's coat. The revolver bore serial number 17214226 and was loaded with six rounds. The officers also recovered 11 pink-top vials, which field-tested positive for cocaine, from the breast pocket of WEAVER's coat. The officers removed the knit cap that WEAVER was wearing, underneath of which they discovered a mask, which WEAVER was wearing but had pulled down to expose his face. Officers then searched UC-1's vehicle and recovered two black woolen gloves from the floor underneath the passenger seat. The gloves were not inside the vehicle before WEAVER entered the vehicle to accompany UC-1 into the storage facility. Officers also recovered a cell phone belonging to WEAVER from the ground next to UC-1's vehicle.

33.     Meanwhile, a second team of law enforcement officers approached the black Nissan Maxima in the Royal Farms parking lot and placed BROOKS, JACKSON, and SUMPTER under arrest. At the time of the arrest, SUMPTER was in the driver's seat of the vehicle, BROOKS was in the rear driver's side seat, and JACKSON was in the rear passenger side seat. During searches incident to arrest, officers recovered black masks from both BROOKS and JACKSON. Both were wearing the masks on their head. Officers then conducted a search of the vehicle. From the glove box, center console, and trunk, the officers recovered paperwork and prescription medication bearing SUMPTER's name. From the floor in front of the rear passenger side seat

(where JACKSON had been sitting), the officers recovered a black Keltec 9 millimeter handgun bearing serial number AUY36. The handgun was loaded with 10 rounds, one of which was in the chamber. The officers also recovered a pair of black woolen gloves from the same location. From the floor in front of the rear driver's side seat (where BROOKS had been sitting), the officers recovered one black woolen glove. The officers discovered another black woolen glove on the rear driver's side seat itself. The officers also recovered four cell phones —one from the center console; another from the front passenger seat; a third from inside the pocket on the rear side of the passenger seat; and a fourth from the ground outside the rear driver's side door.[3]

34.     Following the arrests, FBI agents and task force officers interviewed (or attempted to interview) each of the defendants individually. At the beginning of each interview, the agents and task force officers advised the defendants of their *Miranda* rights. WEAVER and JACKSON both declined to speak with investigators. BROOKS and SUMPTER, by contrast, both waived their *Miranda* rights and provided statements.

35.     During their respective interviews, BROOKS and SUMPTER both attempted to distance themselves from the robbery plot and made a number of false exculpatory statements. BROOKS admitted, however, that he and WEAVER sold drugs together. He also stated that he sold heroin, crack cocaine and fentanyl. He explained that he was a "hitter," *i.e.*, a retail-level drug dealer, and that he sold approximately "400 pills" per day. Asked by investigators about the robbery plan, BROOKS initially stated that he and his associates were planning to take "coke" in connection with the robbery but he later corrected himself and stated that they planned to take heroin. SUMPTER told investigators that he had driven WEAVER to the McDonald's restaurant so that WEAVER could meet with UC-1 on March 6, 2019. With respect to the robbery plan,

---

[3]     BROOKS had dropped the phone in this location as officers were placing him under arrest.

15

SUMPTER stated that WEAVER was "basically going to work him or play him [*i.e.*, UC-1]." Asked by investigators to elaborate, SUMPTER stated that WEAVER was going to "like burn him, like work him, see what he got, burn him."

## CONCLUSION

36.     Based on my training and experience, I know that possession of multiple kilograms of heroin (the quantity of heroin that the defendants believed they would be robbing from the fictitious stash house) is consistent with the intent to distribute that heroin to other persons. Based on this and the evidence discussed above, I believe that the defendants conspired with each other to rob their anticipated victims of multiple kilograms of heroin and to sell the stolen heroin on the streets of Baltimore.

37.     To the best of my knowledge and belief, all statements made in this affidavit are true and correct. Based on the foregoing, I believe there is probable cause to support the issuance of a criminal complaint charging the defendants with (i) conspiracy to distribute and possess with intent to distribute heroin, in violation of 18 U.S.C. § 846; and (ii) conspiracy to obstruct, delay, and affect commerce by robbery, by the unlawful taking of narcotics and narcotics proceeds from the person and presence of victims, in violation of 18 U.S.C. § 1951.

FBI Special Agent Francisco M. Rego

Subscribed and sworn to before me this ____ day of March 2019.

The Honorable Stephanie A. Gallagher
United States Magistrate Judge
District of Maryland

16